Third case this morning is West Side Salvage v. RSUI Indemnity. Mr. Priston. Thank you, Your Honor. May it please the Court. Mr. Wadley, Mr. Conlin. The district court below improperly submitted summary judgment to RSUI, despite the fact that the record before it clearly demonstrated two things. One, all parties that had claims against West Side, that is Mr. Jentz and Mr. Schmidt, as well as ConAgra, unequivocally and repeatedly informed West Side and RSUI of their willingness to completely release West Side in exchange for the payment of West Side's limits. Second, the evidence also overwhelmingly demonstrated that the parties involved in this case evaluated West Side's liability at having exposure that would be at or likely above and far above its limits, and that those evaluations increased as trial approached to the point that there was no one left who questioned that this was Now, RSUI represents ConAgra and ACE, never actually presented a global settlement offer, but rather demanded that RSUI tender the policy to limit them so that they could approach the plaintiffs and see if they could resolve the case. Is that accurate? And if so, was there ever a true settlement offer that RSUI can be faulted for rejecting? Yes, Your Honor. There were repeated global offers of settlement, and the record is filled with those, as we cite to in our brief. For example, I'll begin with the first mediation that was held in this case in January of 2012. At that mediation, ConAgra's representatives, including on behalf of its carriers, informed RSUI that they would completely release West Side in exchange for the payment of RSUI's limits. That was how much? $12 million. $12 million? Is that in addition to the $1 million? Colony, the underlying carrier, had a $1 million policy, and RSUI, the excess carrier, had $11 million. So that's a total of 12? Yes, Your Honor. At that same settlement conference, Bob Clifford informed West Side and its carrier that he would settle in exchange for the limits. So, unequivocally, the record in this case has under oath sworn testimony from all participants involved in that case that there was a global offer that was presented. Now, of course, the judge felt that the deposition testimony of the various lawyers involved in the case was largely speculative, and that the notion that the case could have been resolved had RSUI's counsel been more willing for RSUI to tender its policy limits was essentially a case of Monday morning quarterbacking. But you're saying the exact opposite. Not only am I saying that, Your Honor, but I would say more specifically the witnesses in this case under oath said that more importantly. And it's not a matter of assessment or argument, as Judge Reagan, unfortunately, weighed into, but rather it's a matter of sworn under oath testimony that I would submit was not contradicted by a single, there was not a single affidavit or deposition transcript where anyone contradicted the sworn testimony of at least three lawyers who said that those statements were communicated. That was unrebutted in the record in this case. More importantly, if we look at the standards applicable on summary judgment, in contrast to what Judge Reagan did here, he violated the two fundamental aspects of what he should have done on a summary judgment record. One, rather than viewing the evidence in a light most favorable to West side, he did the opposite. And the reference that Your Honor just made from his ruling was a precise example where he looked at sworn testimony of lawyers and said I'm going to disregard that because I think it's speculative. He chose to view it in a light most favorable to RSUI. Two, he engaged in the weighing of evidence, weighing of credibility, determinations as to what weight he would ascribe to oral testimony versus that of written testimony in diametric opposition to the standards that are applicable to summary judgment. In doing so, he weighed in as if he was a finder of fact following a trial on the record rather than a judge confronting a summary judgment. In doing so, he committed plainly reversible error. Now, RSUI argues in its brief that it wasn't obligated to take the initiative in settlement discussions or to make its own offer, but only to respond in good faith to offers made by the other parties. I mean, would you agree with that view of things? I would disagree on two grounds. First of all, it would be a factually inaccurate statement for RSUI to suggest that it didn't have to initiate it because the facts demonstrate that the parties were repeatedly coming to RSUI. Critically, both Jensen-Schmidt and ConAgra at the same time were in fact presenting opportunities to settle. Even if they did so independently, they clearly communicated one message to RSUI that was global. Pay your attention to the fact that both Jensen-Schmidt and ConAgra at the same time were in fact presenting opportunities to settle. Who is the dominating person in these negotiations, if there was one? The dominant person on behalf of RSUI was a lawyer that it hired to be monitoring counsel, principally a woman named Natalie Limber. She was the individual who was at the proceedings handling the day-to-day communications. The principal party on behalf of ConAgra was an attorney named Kim Moody, who was appearing on behalf of ConAgra's carrier, Ace. The principal negotiator on behalf of plaintiff Jensen-Schmidt was their attorney, Bob Clifford. Clifford? Yes. I don't recall exactly the names of them. The woman that you just mentioned and another one, were they not talking to each other or some kind of problem? The observations, again, that were presented in the record to the district court that we thought were useful for purposes of demonstrating how RSUI had failed its duty included testimony, sworn under oath testimony of lawyers, that their observation was that the two insurance representatives had become involved in the words used by John Schultz, were a cold war. And that rather than... A what? A cold war. Cold war. And that rather than communicating with one another for purposes of looking out for the insured's interest, a personality struggle had caused them to not do that. And in particular with regard to RSUI's representative, West Side should have been represented by someone who was solely looking out for ensuring that its interests were properly protected and instead the record before the district court indicated that there were personality clashes that were interfering with that. Well, and you look at the bottom line, obviously when this thing did go to trial, it went through the roof. And what was it? Forty-some million? Forty-eight million dollars of compensatory liability that eventually, after this court's Seventh Circuit ruling in the Jentz-Conagra matter, forty-eight million dollars of liability, almost, well, exactly four times the liability limits of West Side. And so, of course, the magistrate judge sort of predicted that, as I recall. Judge... I'm sorry, I didn't mean to cut you off. No, well, finish. Is that... Judge Frazier at the settlement conference specifically informed both RSUI, as they confirmed in writing back to the home office, that they were told by Judge Frazier, a magistrate with twenty years of experience, that he analyzed this case and that he predicted that it would be the largest verdict entered in the Southern District. He contrasted that with what he predicted would be rendered the second largest verdict, which was for ninety-five million dollars. He told these people that he thought this was going to be bigger. He also told them that he thought that they should pay their limits. He told RSUI, pay your limits to avoid bad faith. And RSUI confirmed that in writing back to the home office. Judge Reagan never cites that fact in his decision, demonstrating the extent to which he engaged in a weighing of evidence that was inappropriate on a summary judgment standard. What's more, at the time that Judge Frazier made that analysis of the anticipated liability, RSUI's own analysis was that, at that time, West Side's percentage  That was RSUI's analysis. So in January of 2012, RSUI has two numbers that mathematically demonstrate why it needed to pay its limits. Fifty percent liability, a hundred million dollar analysis by an experienced magistrate in this district, which tells them the exposure to West Side was fifty million dollars. Within two million dollars of the actual end result in this case. And at that same time, they were being told by all parties, if you pay us your limits, we will let West Side out. And confronted with those contrasting views, and confronted with that liability, and that exposure, and that opportunity to settle, RSUI did nothing. They did nothing. What, where Judge Reagan found this speculative, what particular testimony do you disagree with? Well, first of all, you can look at what we cited for Joe Orlet. Joe Orlet very clearly said, I recollect that I told repeatedly that I told the parties that we would let West Side go if RSUI would pay its limits. He didn't speculate, he didn't guess, he said that. Bob Clifford in his testimony said, I repeatedly told RSUI that I will let West Side go if they pay their limits. Judge Reagan actually misstated multiple times in his ruling that Bob Clifford said he would not accept the limits once the jury was impaneled. In fact, Bob Clifford said precisely the opposite. He said, I would have accepted their limits. I didn't want an empty chair, so we would have had to have worked out how to keep them in the courtroom, or how to inform the jury of what would have happened. But yes, I would take their limits. He said that under oath, and Judge Reagan, in complete contravention of that, said Bob Clifford said he wouldn't have taken the limits. If you look at it, we cited over and over where Bob Clifford said the opposite. In addition, Leo Knowles, the in-house attorney on behalf of ConAgra testified. Just a minute. It's true that when Clifford was deposed, he said he would have been amenable to, to keeping West right in the case to avoid the empty chair. But on terms, that would have took West's liability at the insurance policy limits. But that's inherently speculative. Clifford himself never made such an offer after the trial commenced, as I understand the history of the case. Your Honor, I would direct you to the citations that can be found in the docket at 55-3, pages 3, 55-3, that's the docket entry, pages 3, 6, and 9. At each of those, Bob Clifford, each of those represent portions of the deposition in which Bob Clifford stated that during the trial that he expressed his continued willingness to release West side in exchange for the policy limits. In addition to that, there was also an intervening meeting that took place in March of 2012 in the Becker, the matter of Becker. At that meeting in March, once again, Bob Clifford has testified that he told the parties that he would settle. ConAgra has testified that they told RSUI they would settle. And again, the evaluation of liability had not gone down. If anything, it had gone up. Clifford represented the two people who were injured the worst, right? Correct, Your Honor. I don't remember their names, but they're serious. Bob Clifford represented Jentz and Schmidt. Yeah, and they both had very serious burns and injuries. Jentz in particular had probably very likely the most serious and in fact was awarded the compensatory damages indicating the jury felt that his were the most serious. I'd like to go back because ConAgra and NACE never actually made a settlement offer. They wanted RSUI to tender its limits and then they would approach the plaintiffs and see if they could settle the case. I didn't see any response in the gray brief to that point. So, you know, I thought was, well, look, if there was no concrete offer, I don't see how RSUI can be faulted for not tendering the policy limits. You want to answer it now? Yes, Your Honor, and I think that we had cited in our initial brief and in our reply to those offers, but I would tell you, again, those pages that I recited to Bob Clifford's deposition which can be found at 55-3 at the pages that I recited, 36-2 at pages 109 to 110. ConAgra at in the deposition which we cited the court to at 56-5, page 5, and also at 56-4, pages 13 to 14, demonstrate their statements that they would settle in exchange for the policy limits. Once RSUI tendered its limits, only then would they approach the plaintiffs, is what it seems to have been said. And, Your Honor, I would implore that you review those record citations and I think that you will find that they support our position that, in fact, those statements were made directly from the plaintiff, Jensen Schmidt, to RSUI and from ConAgra to RSUI that says, if you pay your limits, we will let West side out. And that was unconditional and represented in total a global settlement offer. And in addition, it's vital to keep in mind that this is measured against a summary judgment standard which is, is there evidence by which one could conclude that those statements were made as opposed to a decision following a trial. I know your time, but as I understand it, globally or whatever you want to call it, these claims have all been settled and we're down to the $3 million. Is that correct? That is correct. And it's what ConAgra and ACE and whatever, and that's who's arguing who should pay that. Basically what others are trying to say is that had RSUI come up with the, we'll call it $12 million, that all would have been dissipated. Instead, that didn't happen and now they're still arguing over who's going to pay $3 million. That's right, Your Honor. Our position is that ConAgra, when ConAgra informed RSUI on several occasions that it would enter into a full settlement with Westside, including if Westside paid its money to Jensen Schmitt, they specifically testified to that. That was in the record in front of the district court that the testimony was. ConAgra agreed even if the money was paid directly to Jensen Schmitt and not to ConAgra, they were willing to release Westside from everything, including the property damage that is now the $3 million issue that we are dealing with. Thank you, Counselor. Thank you. Mr. Wadley. Good morning, Your Honors. Chris Wadley on behalf of RSUI. May it please the Court. Your Honors, I'm going to be as polite as I possibly can, but Mr. Preston has completely overstated and misstated what's in the record in this case. I want to jump right to the point that we were talking about in Mr. Preston's presentation about the evidence of a settlement opportunity to resolve all claims within the limits. It simply did not exist. No specific offer of settlement was made to RSUI that said, if you pay your $12 million to Jensen Schmitt, that ConAgra and ACE will agree to release those claims that they had against Westside, including this property damage judgment, which is the subject of this dispute. And I just want to read, Leo Knowles was the general in-house counsel for Westside. I'm sorry, for ConAgra. Leo Knowles. So he was the guy, in-house counsel for ConAgra. And I asked him this question during his deposition. You testified previously that ConAgra was prepared to dismiss the property damage and indemnity claims if Westside made the $2 million available. Is that right? Answer, correct. Question, was ConAgra willing to do that if Westside settled directly with the plaintiffs for the policy limits? Answer, I don't think that question was really put to us in that fashion. Question, what about ACE? Do you have any indication whether ACE would have been willing to let go of the indemnity claims if Westside had settled directly with the plaintiffs? Answer, that question was never posed. Consequently, I don't really have an answer. And then later in his deposition, I asked Mr. Knowles' question. On this concept of whether ACE would have gone along with dismissing the indemnity if RSUI would have made the $12 million available, I think you testified to this earlier, but you can't say one way or the other, can you, that ACE would have agreed to release the indemnity claims if Westside had settled directly with the plaintiffs. Is that correct? Answer, I don't think ultimately when they finally made the proposal about releasing the indemnity claims and the property claim, I don't think that was in the context of a direct offer to the plaintiffs. Question, right. That was in the offers made by ACE were in the context of RSUI making the money available to ACE to go and negotiate with the plaintiffs. Is that correct? Answer, right. So all of the settlement opportunities that were presented to RSUI in this case were ACE. And first of all, it was ACE that spoke on behalf of both ConAgra and ACE with respect to the settlement negotiations. All the settlement offers came from Kim Moody. Council conceded that Kim Moody was the principal negotiator from their side. What were the policy limits on ACE? Well, I'm not entirely clear on that. I believe it was $25 million in excess. Pretty far up there, right. Yeah, it was $25 million in excess of, I believe, a $3 million self-insured retention. And then ConAgra had like $200 million of excess coverage above that. So ConAgra was well insured. But ACE was trying to negotiate a settlement within its layer. And so throughout the proceedings, what was presented to RSUI was, in order for any negotiations to take place, you have to make your policy limits available, and then we'll perhaps throw a sweetener on top of that, something within our limits, and this whole thing goes away. There was never, ever, and it's not in the record, never communicated to RSUI by someone with authority, i.e. Kim Moody, that said, yes, you go ahead and settle yourself with the plaintiffs, get out of this case, and we'll let you walk from the property damage and indemnity claims. You say that's not in the record. What were you citing to? I was citing Leo Knowles, and that's at docket 36-3 at pages 77 to 78, and also docket 36-3 at 81 to 82. Now that's ConAgra's in-house counsel. And for whatever reason, the plaintiff, in this case Westside, decided not even to take the deposition of the ACE representative, Kim Moody, so there's no testimony from the ACE personnel. The only thing that we have in the record as far as settlement offers from ACE are in the middle of trial. ACE presented RSUI with a two-pronged settlement proposal, one of which was give us your $12 million and we'll release ConAgra's claims against Westside, which would have been completely disastrous because then Westside would have been left holding the bag on the plaintiff's claims without any insurance coverage because it all would have been exhausted paying to ConAgra and ACE. The second alternative was what we've just been talking about. You give us your $12 million to go negotiate with the plaintiffs, and if we're successful in resolving this entire case, then we'll drop our property damage and indemnity claims. But it was only on the condition that a global resolution be reached, and that's where it gets speculative, Your Honors, is to say that, well, had we made the $12 million available, ConAgra and ACE would have gone out and successfully negotiated a global resolution with the plaintiffs. Speculative because the plaintiffs never made a global demand during the trial. The one that they made pretrial was around $77 million, and we know that ACE and ConAgra weren't even to put $12 million of their own on top because in response to those two demands, RSUI responded to ACE and said, we will make our $12 million available if you match us dollar for dollar to make an offer to the plaintiffs of up to $24 million, and ACE said, forget it. We'll negotiate separately. You're on your own. I want to talk to you, Mr. Wadley. I want to just talk to you about Mr. Clifford for a minute. Sure. Because even once the trial was underway, wasn't it reasonably clear that Mr. Clifford was still amenable to resolving Westside's liability bully, even if he insisted that Westside was nominally going to remain in the case in order to avoid, you know, the empty chair problem? Right. And this is where it's important that we keep in mind the liability that's the subject of this current dispute is the liability to ConAgra on the breach of contract property damage. Obviously Clifford did not have the ability to give Westside a release of ConAgra's claims. All Clifford could have done was perhaps given a covenant not to execute on the Jentz and Schmidt judgments, and those judgments have been resolved. They're not at issue here. It's the ConAgra judgment that's the issue. And, you know, even if we had reached some agreement with Bob Clifford about capping Westside's liability to the plaintiffs at $12 million, that does nothing about the liability that we're talking about here today. And now this is where it actually gets important now to take a look at what Joe Orlet said. While Joe Orlet said, you know, any settlement offers would have been a joint decision with Ace, and, you know, it was Kim Moody that was speaking on behalf of Ace, what he did say was from a strategic standpoint, he would have liked for Westside not to have been at the trial because basically at the trial he had two people pointing at ConAgra saying, ConAgra, you're at fault. He had the plaintiffs blaming ConAgra, and he had Westside's attorney blaming ConAgra. So when he speculated that there would have been let out of the case, he was saying, look, if Westside had settled with the plaintiffs before trial and got out of the case, then, you know, we may have been willing to release the property damage claims to get them out of the trial because we didn't want to have to deal with another attorney pointing the finger at us at trial. But Clifford was unwilling to release Westside from the trial because he didn't want the empty chair. So he wanted Westside in the case for the same reason that ConAgra wanted them out, was that he wanted another partner in beating up on ConAgra because ConAgra was the deep pocket that they ultimately did get hit for, I think it was $160 million when you include $100 million in punitive damages, got reversed before this court. But nevertheless, so it was an impossible situation where you had Clifford saying, yeah, I'll take your $12 million, but you've got to stay in the case because I don't want an empty chair. And ConAgra's attorney, again, whether he was speaking on behalf of Ace, well, he said he wasn't speaking on behalf of Ace, but he was suggesting, yeah, maybe we would have let them out because we didn't want them in the trial. So you can't have both. And that's kind of the point that the district court was getting at here in granting summary judgment was that, look, there were so many competing interests and so many, as the judge called it, cooks in the kitchen here to try to resolve this case in the middle of a trial that it just couldn't happen. And what we do is, I mean, we go back to what is the test? What is the requirement for bad faith? Now, we've got a lengthy choice of law analysis. We believe that Iowa law applies on the bad faith case here. But at the end of the day, we think we prevail under both tests because what you have to do to show bad faith as a matter of law is you have to have evidence showing two things. And number one is you have to have a settlement offer or demand, however you want to phrase it, a settlement demand within limits that will resolve the claims that are made against the insured. At the same time, the insurance company has to have no reasonable basis for rejecting that settlement demand within limits. Here we assert that Westside's case failed on both accounts because, number one, you didn't have a specific offer of settlement within limits. It was purely speculative. Give the money available to Ace to go negotiate. Maybe they successfully negotiate. Maybe they don't. And second is at least up until the middle of trial, the recommendation from Westside's defense counsel, and this is not RSUI counsel. This is Westside's defense counsel hired by the primary carrier colony, John Schultz, who puts the liability exposure well within the limits, and he says repeatedly that the exposure is within the limits. In fact, Mr. Preston mentioned, I believe it was the February or maybe March mediation. It was actually a mediation in the Becker case, and it was at that case that Ace and ConAgra again said, you know, make your limits available. We're not offering a nickel until you guys make your limits available. And when John Schultz, Westside's defense counsel, reported that to colony, which was the primary carrier and RSUI, he said this case does not warrant a contribution of $12 million. So RSUI and beyond that, Westside hired a bad faith expert in this case named Alan Wint who's got a treatise on insurance law, and he was their expert in this case. And on several occasions he said, I agree. There was no duty to settle before trial because RSUI was reasonable based on the information it was receiving from defense counsel in not paying policy limits to settle this case. That was admitted by the plaintiff's own bad faith liability expert. The likelihood of an excess verdict became apparent, at least according to the plaintiff's evidence, in the middle of trial when the testimony started to go south. And at that point, defense counsel says, I think there's, because he was initially, he initially thought it was going to be 25% fault, and I think between $8 and $11 million. So the net exposure to Westside would have been somewhere in the $2 to $3 million range. Middle of trial, John Schultz says, no, this is not going very well. I think we're looking at a 50-50 liability split, and I think we're looking at $28 to $40 million in damages. So Westside's bad faith expert says at that point, RSUI, now you know that there's a likelihood that this case is going to go excess. But at that point, there's certainly no opportunity at that point forward to settle this case within the limits. The only offers that are made during trial are those two ACE offers, which I spoke about earlier, which, again, one, had it been taken, would have been a complete disaster for Westside. The second one is entirely speculative as to whether it would have resolved the case. So, again, we don't think that they've met their burden here of introducing sufficient evidence beyond a speculative level upon which it could be concluded that two things happened simultaneously. One, that there was an appreciation of an exposure above the limits, and two, a settlement opportunity to resolve all these claims within the limits. And now I see that my time is shortly expiring. I just do want to say, we do argue as a threshold matter that this property damage breach of contract judgment isn't covered, and we've got various reasons for that, which are laid out in the briefs, and we think that if the court concludes that it's not covered, then we can't be liable for that additional reason. But with that, I will, if the panel doesn't have any further questions, I will conclude. Thank you, Counsel. Thank you. How much time? You're out of time. Thanks to both counsels, the case will be taken under advisement, and we move to the fourth case this morning.